02-10-229-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-10-00229-CV

 


 
 
 MICHAEL MURPHY
 
 
  
 
 
 APPELLANT
 
 


 

V.

 


 
 
 ERNEST REYNOLDS III
 
 
  
 
 
 APPELLEE
 
 


 

 

------------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION[1]

------------

I.  Introduction

          In
five issues, a media defendant, Appellant Michael Murphy, brings this
interlocutory appeal, asserting that the trial court erred by partially denying
his motion for summary judgment.  See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(6) (West 2008).  We are constrained to reverse and render.

II.  Factual and Procedural History

          Appellee Ernest Reynolds, III sued Murphy, a
technology-sector stock analyst and author of a newsletter, book, and telephone
“hotline,” for losses incurred from investments Reynolds made based on
recommendations in Murphy’s newsletter, Technology Investing.  The parties
have appeared before this court on three prior occasions related to different
aspects of the underlying lawsuit.  See Reynolds v. Murphy (Reynolds
III), 266 S.W.3d 141 (Tex. App.—Fort Worth 2008, pet. denied); In re
Reynolds (Reynolds II), No. 02-07-00256-CV, 2007 WL 2460279 (Tex.
App.—Fort Worth Aug. 31, 2007, orig. proceeding); Reynolds v. Murphy (Reynolds
I), 188 S.W.3d 252 (Tex. App—Fort Worth 2006, pet. denied) (op. on reh’g)
(containing a detailed factual history of the case), cert. denied, 549
U.S. 1281 (2007).

          In April 2010, after our opinion in Reynolds
III, Reynolds filed his fourth amended petition in which he sought damages
and attorneys’ fees and claimed that Murphy (1) violated Texas Business and Commerce
Code section 27.01, articles 581-33 and 581-33-1 of the Texas Securities Act
(TSA), and National Association of Securities Dealers (NASD) rules; (2) breached
a fiduciary duty to Reynolds; (3) committed common law fraud (the surviving
claim from our disposition of Reynolds I); and (4) committed negligence,
gross negligence, and negligence per se.  After the parties conducted
discovery, Murphy filed a motion for a traditional and a no-evidence summary
judgment and a supplemental summary judgment motion on all of Reynolds’s claims,
to which Reynolds responded.  After overruling each party’s objections to
summary judgment evidence, the trial court granted Murphy summary judgment on
Reynolds’s negligence and gross negligence claims but denied summary judgment on
Reynolds’s first three claims.  This interlocutory appeal followed,[2]
with Murphy asserting that his motions should have been granted as to all of
Reynolds’s claims.

III.  Summary Judgment

          In his third and fourth issues, Murphy
argues that the trial court erred by denying his motion for summary judgment on
Reynolds’s nonnegligence claims because (1) Murphy was not an investment
advisor and was not a primary violator or aider and abettor in the sale or
purchase of stock, thus, he did not violate business and commerce code section
27.01, TSA articles 581-33 or 581-33-1, or NASD rules; (2) Murphy did not owe a
fiduciary duty to Reynolds, and (3) Reynolds’s fraud claims were barred by
limitations or, in the alternative, Reynolds’s fraud claims fail as a matter of
law because Reynolds neither met his burden to show that Murphy made any
material misrepresentations or his burden to show that Murphy’s actions caused
him damage.[3]

A.  Standard of Review

          In this summary judgment case, the issue on
appeal is whether Murphy met the summary judgment burden by establishing that
no genuine issue of material fact existed and that he was entitled to judgment
as a matter of law.  Tex. R. Civ. P. 166a(c); Mann Frankfort Stein &
Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We
review his summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).

          We consider the evidence presented in the
light most favorable to Reynolds, crediting evidence favorable to him if
reasonable jurors could, and disregarding evidence contrary to him unless
reasonable jurors could not.  Mann Frankfort, 289 S.W.3d at 848.  We
indulge every reasonable inference and resolve any doubts in Reynolds’s favor. 
20801, Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  Murphy, as defendant
below, was entitled to summary judgment on an affirmative defense to Reynolds’s
claims if he conclusively proved all the elements of his asserted affirmative
defense.  Frost Nat’l Bank v. Fernandez, 315 S.W.3d 494, 508–09 (Tex.
2010), cert. denied, 131 S. Ct. 1017 (2011); see Tex. R. Civ. P.
166a(b), (c).  To accomplish this, Murphy must have presented summary judgment
evidence that conclusively established each element of his affirmative defense. 
See Chau v. Riddle, 254 S.W.3d 453, 455 (Tex. 2008).

          In the
no-evidence motion, Murphy, as defendant below and the party without the burden
of proof, moved for summary judgment on the ground that there was no evidence
to support an essential element of Reynolds’s claims.  See Tex. R. Civ.
P. 166a(i).  The motion was required to specifically state the elements for
which there was no evidence, and the trial court was required to grant the
motion unless Reynolds produced summary judgment evidence that raised a genuine
issue of material fact as to those issues.  See id. & cmt.; Timpte
Indus., Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009); Hamilton v.
Wilson, 249 S.W.3d 425, 426 (Tex. 2008).

          When
reviewing this no-evidence summary judgment, we examine the entire record in
the light most favorable to Reynolds, indulging every reasonable inference and
resolving any doubts against the motion.  See Sudan v. Sudan, 199 S.W.3d
291, 292 (Tex. 2006).  We review this no-evidence summary judgment for evidence
that would enable reasonable and fair-minded jurors to differ in their
conclusions.  See Hamilton, 249 S.W.3d at 426 (citing City of Keller
v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005)).  We credit evidence favorable
to Reynolds if reasonable jurors could, and we disregard evidence contrary to Reynolds
unless reasonable jurors could not.  See Timpte Indus., 286 S.W.3d at
310 (quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006)).  If Reynolds brought forward more than a scintilla of probative
evidence that raised a genuine issue of material fact, then a no-evidence
summary judgment was not proper.  Smith v. O’Donnell, 288 S.W.3d 417,
424 (Tex. 2009); King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003), cert. denied, 541 U.S. 1030 (2004).

B. 
Article 581-33-1: Investment Advisor 

          In his third issue, Murphy asserts that because
he is not an “investment advisor” as defined by TSA article 581-4(N), the trial
court erred by denying his motion for summary judgment on Reynolds’s article
581-33-1 claim.[4]
 In his motion, Murphy asserted that he was an author of a bona-fide
publication and not an “investment advisor” for purposes of the TSA.

1.  Applicable Law

          Article 581-33-1 outlines the civil
liability that investment advisors have to their clients.  See Tex. Rev.
Civ. Stat. Ann. art. 581-33-1 (West Supp. 2010).  Article 581-4(N), added
in 2001, mirrors the federal Investment Advisors Act’s (IAA) definition, and defines
“investment advisor” to

[i]nclude[ ] a
person who, for compensation, engages in the business of advising another,
either directly or through publications or writings, with respect to the value
of securities or to the advisability of investing in, purchasing, or selling
securities or a person who, for compensation and as part of a regular business,
issues or adopts analyses or a report concerning securities, as may be further
defined by Board rule.  The term does not include:

 

. .
. .

 

(4) the publisher of
a bona fide newspaper, news magazine, or business or financial publication of
general or regular circulation[.]

 

Id. art.
581-4(N) (West 2010); see also 15 U.S.C.A. § 80b-2(a)(11) (West
2009); House Research Org., Bill Analysis, Tex. H.B. 2255, 77th Leg., R.S.
(2001) (indicating that the addition codified, but did not alter, the Texas Securities
Board’s existing rules and exemptions regarding the regulation of investment
advisors).  Oversight of investment advisors is split between state and federal
authorities.  See 15 U.S.C.A. § 80b-3a (West 2009).  Any
entity or person qualifying for an exemption under the federal definition of
investment advisor is statutorily exempt from state registration.  See id.
§ 80b-3a(b)(1)(B) (noting that an entity exempt under § 80b-2(a)(11)
is not subject to state registration, licensing, or qualification).

          Consistent then with article 581-4(N)(4), we
will examine whether Murphy (a) was a publisher (b) of a bona fide financial
publication (c) of general circulation.[5] 
We revisit Lowe v. Securities & Exchange Commission, 472 U.S. 181,
105 S. Ct. 2557 (1985), for guidance.  See Reynolds I, 188 S.W.3d at 263
(quoting Lowe, 472 U.S. at 183, 105 S. Ct. at 2559).  As we noted in Reynolds
I, the issue in Lowe “was whether the Securities and Exchange
Commission . . . could obtain a permanent injunction under the federal
Investment Advisors Act (IAA) . . . [against an unregistered publisher,
in order to stop] publication of securities newsletters containing ‘nonpersonalized
investment advice and commentary.’”[6] 
See id.  The Supreme Court concluded that Lowe’s publications met the
statutory exemption, holding that they did “not fit within the central purpose
of the [IAA] because they [did] not offer individualized advice attuned
to any specific portfolio or to any client’s particular needs,” and that Lowe—a
publisher—was not an “‘investment advisor’ as defined by the act.”  Lowe,
472 U.S. at 208–11, 105 S. Ct. at 2572–2573 (emphasis supplied).  In reaching
its conclusion, the Supreme Court reviewed the publications to determine if
they were of “general and regular circulation” and ultimately concluded that impersonal,
nonindividualized communications “do not develop into the kind of
fiduciary, person-to-person relationships . . . that are characteristic of
investment advisor-client relationships,” and are thus presumed to be exempt
and not subject to registration under the IAA.  Id., 105 S. Ct. at 2572–73. 
It is axiomatic to say that we are required to follow this reasoning, and having
previously held that Murphy’s newsletter was of general circulation like those
found in Lowe, see Reynolds I, 188 S.W.3d at 266–67, we must
determine whether Murphy—an author—falls under the IAA’s definition of “publisher”
and whether Murphy’s newsletter qualifies as “bona fide” within the meaning of
the statute.

a.  “Publisher”

          In his response, Reynolds argues that the
denial of summary judgment was proper because the exemption does not apply to
Murphy.  Specifically, Reynolds argues that we must strictly construe the
statute, including the term “publisher,” and therefore because Murphy admitted that
he provided investment advice and that he was an author, and hence not a
publisher, he is an investment advisor under the statute.

          We first note that in the “admissions”
Reynolds references, Murphy stated that he provided “general investment advice,
. . . not personalized.”  And, even though in his deposition Murphy indicated
that he was not a publisher, his “admission” is not determinative of the legal
effect of any distinction between author and publisher.

          The Supreme Court has emphasized that “Congress
intended the [IAA] to be construed like other securities legislation ‘enacted
for the purpose of avoiding frauds,’ not technically and restrictively, but
flexibly to effectuate its remedial purposes.”  SEC v. Capital Gains Research
Bureau, Inc., 375 U.S. 180, 195, 84 S. Ct. 275, 284–85 (1963) (footnote
omitted).  The TSA is both penal and remedial, but when the TSA is invoked to
enforce a remedy, it should be considered as a remedial and not a penal statute. 
See Dempsey-Tegler & Co., v. Flowers, 465 S.W.2d 208, 211 (Tex. Civ.
App.—Beaumont), rev’d on other grounds, 472 S.W.2d 112 (Tex. 1971).  And,
even if strict construction was required as Reynolds asserts, strict
construction of the statute does not mean isolating terms or phrases from the
context in which they appear.  Thomas v. State, 919 S.W.2d 427, 430
(Tex. Crim. App. 1996); see also Bruner v. State, 463 S.W.2d 205, 215
(Tex. Crim. App. 1970) (concluding that the TSA’s highly penal nature requires
that the act be strictly construed).  Neither does a strict construction mean
that we ignore the plain meaning of terms.  See Thomas, 919 S.W.2d at
430 (citing SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 355, 64 S. Ct.
120, 125 (1943) (“The rule of strict construction is not violated by permitting
the words of the statute to have their full meaning, or the more extended of
two meanings, as the wider popular instead of the more narrow technical one . .
. .”) (quoting United States v. Hartwell, 73 U.S. (6 Wall.) 385, 396
(1867))).

          In Reynolds I, we discussed Ginsburg
v. Agora, Inc., 915 F. Supp. 733 (D. Md. 1995), a federal case applying Lowe
to facts similar to ours.  See Reynolds I, 188 S.W.3d at 264–67.  In Ginsburg,
which involved an author, the court applied Lowe to determine that the
IAA “was designed to apply to those persons . . . who provide personalized
advice attuned to a client’s concerns, . . . [and] offer individualized
advice attuned to any specific portfolio or to any client’s particular needs.” 
Ginsburg, 915 F. Supp. at 737.  The court then concluded that because a
newsletter was generalized in nature, contained impersonal commentary, and did
not provide “individualized advice attuned [to the plaintiff’s] specific
portfolio [or his] particular needs,” the publication was not subject to the
IAA, and that, by extension, the newsletter’s author was not an “investment
advisor.”  915 F. Supp. at 737; see Reynolds I, 188 S.W.3d at 264–65
& n.14.

          Here, Ginsburg’s analysis and
holding apply to the determination of whether an author, such as Murphy,
qualifies as an investment advisor under the IAA.[7]
 We must agree with Ginsburg’s analysis
and holding, and we hold that an author is included within the term “publisher”
found in the IAA’s definition of “Investment Advisor” when the author is not
offering personalized advice to individual investors. Accordingly, we conclude
that if Murphy’s Technology Investing newsletter is a bona fide
publication, it qualifies for the exemption found in 15 U.S.C.A. § 80b-2(a)(11)
pursuant to Ginsburg and Lowe, and therefore, pursuant to 15
U.S.C.A. § 80b-3a(b)(1)(B), Murphy was not required to register as an
investment advisor under the TSA.

b.  Bona Fide

          In Lowe, the Supreme Court determined
that the term “bona fide” applied to the publication and not to the publisher
and that the term translated best to “genuine.”  It then assessed Lowe’s publications
to determine if they contained false or misleading information or if they touted
any security in which Lowe had an interest.  Lowe, 472 U.S. at 208, 105
S. Ct. at 2572.  The Supreme Court noted that to “the extent that the
[newsletters] contain[ed] factual information about past transactions and
market trends, and the newsletters [commented] on general market conditions,
there can be no doubt about the protected character of the communications.”  Id.
at 210, 105 S. Ct. at 2573.  Federal law prohibits the “touting” of securities,
including promoting stock in exchange for compensation, without disclosing the
nature and amount of compensation paid.  See 15 U.S.C.A. § 77q(b) (West
2009); SEC v. Liberty Capital Grp., Inc., 75 F. Supp. 2d 1160, 1162
(W.D. Wash. 1999).

          In response to Murphy’s summary judgment
motion, Reynolds argued that Murphy (1) misled Reynolds as to his credentials,
analysis, methodology, and past performance as a fund manager; (2) failed to
disclose that he authored other investing newsletters that contradicted his advice
in Technology Investing; (3) “touted” his professional expertise and the
stocks he recommended; and (4) failed to disclose his criminal background.

          Murphy’s criminal background is not relevant
to determining whether the newsletter is a “bona fide” publication.  See
Lowe, 472 U.S. at 208, 105 S. Ct. at 2572 (noting that the term “bona fide”
pertains to the publication, not the publisher, and therefore the publisher’s
unsavory history would not prevent the newsletter from being “bona fide”).  Thus,
we must determine (1) whether the newsletter violated section 77q(b) by touting
securities and (2) whether the newsletter was disqualified from being bona fide
because it contained false or misleading statements—either about Murphy’s
credentials, analysis, methodology, or fund management performance or by
failing to disclose Murphy’s authorship of other investing newsletters
containing advice contradicting the advice provided in Technology Investing.

          Although Reynolds alleged that Murphy
“touted” securities, nothing in the record shows or allows an inference that
Murphy received compensation from the companies he recommended or that he
personally gained by promoting the companies discussed in the newsletter.  See
U.S.C.A. § 77q(b); see, e.g., U.S. SEC v. Park, 99 F. Supp. 2d 889,
894–95 (N.D. Ill. 2000) (noting that “touting” occurred when an investment
newsletter publisher failed to disclose ownership of, and subsequent profits
on, the stocks he recommended); Liberty Capital Grp., Inc., 75 F. Supp.
2d at 1162 (finding “touting” when publisher of electronic and print stock
recommendations failed to disclose compensation received from companies he
recommended).  Therefore, Reynolds failed to raise an issue of material fact to
show that Murphy “touted” securities in a manner sufficient to bring him under
the IAA’s purview.

          In his petition, Reynolds alleged that the
newsletter falsely represented Murphy’s expertise, methodology, success rates,
and the security of investments made based on Murphy’s recommendations.  The
record contains copies of the advertisements and newsletters that (1) outline
Murphy’s experience, (2) contain investment result excerpts, (3) provide
third-party quotations, recommendations, and success stories, and (4) include articles
authored by Murphy on various topics related to technology sector investing.  Although
Reynolds asserted that Murphy had an overall dismal record as a fund manager, nothing
in the record refutes the validity of the performance summaries listed in the
newsletters or shows that the endorsements and third-party success stories were
manufactured or false.  Additionally, Reynolds does not direct us to any
specific claim of return or guaranteed result to support his claim that
Murphy’s methodologies were inaccurate.  Rather, the record reflects that
Murphy’s newsletters stated that his analysis incorporated a model accounting
for and leveling technology company research funding and that Murphy did in
fact develop and utilize such a model in his recommendations.

          Further, in his response to Murphy’s summary
judgment motion, Reynolds asserted that Murphy’s promotional materials falsely
claimed that Murphy was a “millionaire maker” and a “hugely successful” investment
fund manager, but Reynolds cited no particular page or pages in which these
statements could be found in the ninety-page appendix attached to his response,
which contained copies of the newsletter and promotional materials.  See
Tex. R. Civ. P. 166(a)(i) & 1997 cmt.; Rogers v. Ricane Enters., Inc.,
772 S.W.2d 76, 81 (Tex. 1989) (noting that neither the trial court nor
reviewing courts are required to wade through a voluminous record to marshal
respondent’s proof).  And, simply pointing out these statements does not
provide any evidence raising a fact issue as to whether they were false.  Reynolds
also does not point to any instance in which Murphy promised him individually a
specific rate of return or that his investments would be one-hundred percent secure;
instead, the record shows that Murphy made generalized assertions as to investment
opportunities, performance, and expected or estimated returns—essentially,
Murphy gave his opinion as to future market events.  Therefore, Reynolds’s
summary judgment response evidence is insufficient to raise a fact issue on his
section 581-33-1 claim.  See Guthrie v. Suiter, 934 S.W.2d 820, 826
(Tex. App.—Houston [1st Dist.] 1996, no writ) (noting that attaching entire
document to a response and referencing it only generally does not eliminate a
party’s responsibility to point out to the trial court where in the document
the issues set forth in the response are raised).

          Reynolds also claimed that Murphy’s failure
to disclose authorship of other investment publications that advised
subscribers to sell short, while at the same time he advised Technology
Investing subscribers to avoid selling short, violated section 581-33-1.  We
previously addressed this same claim in Reynolds I, wherein we noted that
Murphy’s recommendations were not misleading because the investment approaches
between the various newsletters differed and that Technology Investing “consistently
emphasize[d] the long-term investment approach . . . as opposed to more
aggressive or short-term methods advocated by Murphy in different contexts.”  Reynolds
I, 188 S.W.3d at 274.  Thus, Reynolds has failed to produce a fact issue to
support his section 581-33-1 claim that Murphy’s advice contradicted the
long-term investment approach outlined in Technology Investing.

          For the reasons set out above, we conclude
that Murphy’s Technology Investing newsletter is a bona fide publication
as defined by the IAA, and by extension the TSA.  Therefore, because Reynolds did
not show that there is a genuine issue of material fact regarding whether Murphy
is anything other than an author entitled to the protection of a publisher of a
bona fide publication of general circulation in response to Murphy’s
summary-judgment evidence, Murphy was entitled to a traditional summary
judgment as a matter of law because he proved that he is not subject to registration
as an investment advisor under the IAA, and by extension under the TSA.  See
15 U.S.C.A. § 80b-3a(b)(1)(B); Ginsburg, 915 F. Supp. at 738.  We sustain the portions of
Murphy’s third issue relative to Reynolds’s claims arising under TSA article
581-33-1.

C.  Article 581-33 and NASD Rules Violation Claims

          Reynolds’s petition alleged that Murphy was “liable
to [Reynolds] pursuant to Art. 581-33, Texas Statutes (Texas Blue Sky Law), . .
. . [And] [a]t all times material, [Murphy] was also an ‘aider and abettor’
under Art. 581-33 . . . .” We construe Reynolds’s petition to claim that Murphy
was either primarily liable under article 581-33A(2) or secondarily liable as
an aider and abettor under article 581-33F(2).  See Tex. Rev. Civ. Stat.
Ann. art. 581-33-1.  In his fourth issue, Murphy argues that the trial court
erred by denying his motion for summary judgment because there was no evidence
to prove that Murphy made a material misrepresentation or omitted a material
fact or that a primary violation of securities laws occurred, necessary elements
of both of Reynolds’s article 581-33 claims.  See Tex. R. Civ. P.
166a(i).

          1. 
Applicable Law

          The Texas Securities Act establishes both
primary and secondary liability for securities violations.  Sterling Trust
Co. v. Adderley, 168 S.W.3d 835, 839 (Tex. 2005).  Primary liability arises
when a person “offers or sells a security . . . by means of an untrue statement
of a material fact or an omission to state a material fact necessary in order
to make the statements made, in the light of the circumstances under which they
are made, not misleading.”  Id. (quoting Tex. Rev. Civ. Stat. Ann. art.
581-33A(2) (West 2010)).  Secondary liability is derivative liability for
another person’s securities violation; it can attach to either a control
person, defined as “[a] person who directly or indirectly controls a seller,
buyer, or issuer of a security,” or to an aider, defined as one “who directly
or indirectly with [an] intent to deceive or defraud or with reckless disregard
for the truth or the law materially aids a seller, buyer, or issuer of a
security.”  Id. (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33F(1)–(2)). 
Both control persons and aiders are jointly and severally liable with the
primary violator “to the same extent as if [they] were the primary violator.”  Id.

The comments to the 1977 revisions to the TSA contain
the notation that article 581-33A(2) “is a privity provision, allowing a buyer
to recover from his offeror or seller.”  Tex. Rev. Civ. Stat. Ann. Art. 581-33,
cmt. §§ 33A(1), (2) (West 2010).  The comment also notes that “some nonprivity
defendants may be reached” under section 33F.  Id.

To prove aider and abettor liability, the plaintiff
must demonstrate: 

(1)  that a primary
violation of the securities laws occurred; (2)  that the alleged aider had
“general awareness” of its role in this violation; (3)  that the actor rendered
“substantial assistance” in this violation; (4)  that the alleged aider either
(a) intended to deceive [the] plaintiff or (b) acted with reckless disregard
for the truth of the representations made by the primary violator.

 

Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.]
2000, pet. denied); see also In re Enron Corp. Sec., Derivatives & ERISA
Litig., 235 F. Supp. 2d 549, 568 (S.D. Tex. 2002).

          2. 
Analysis

          Reynolds’s petition generally alleged that
Murphy violated article 581-33 and that Reynolds purchased stock based on
Murphy’s violations.  Reynolds did not specify which transaction or
transactions in the over 125 pages of his brokerage account statements in the
record qualified as the primary securities law violation that supported his claim. 
See In re Perry, 404 B.R. 196, 219 (Bankr. S.D. Tex. 2009) (noting that a
failed investment is not necessarily a mark of securities fraud actionable
under the TSA).  Reynolds’s petition cited NASD Rule 96-60[8]
and New York Stock Exchange Rule Interpretation 90-5[9]
to support his position that the contents of Technology Investing constituted
Murphy’s recommendations on specific securities and that a recommendation of a
specific security qualifies as a transaction.  However, because we have
determined that Murphy is not an investment advisor and because Reynolds has
not alleged or proven that Murphy is a registered securities dealer or broker,
Murphy is not subject to NASD or NYSE rules.[10] 
See 15 U.S.C.A. §§ 78f, 78o, 78o-3 (West 2011) (providing statutory
authority for the creation of registered securities associations (such as NASD
and NYSE) and rules to govern securities exchanges and registered brokers and
dealers).

          Second, Reynolds also generally alleged that
he would not have purchased stock “but for” Murphy’s advice, but he provided no
evidence that Murphy or another party qualified as a primary violator, that is,
that Murphy or another party, such as Reynolds’s broker, brokerage firm, or the
issuing company, “offered” or “sold” Reynolds the stock in question by means of
an untrue statement or omission of a material fact, as required to invoke the
protections of article 581-33.  See Flowers v. Dempsey-Tegeler & Co.,
472 S.W.2d 112, 113, 115 (Tex. 1971) (noting the TSA applies to persons and
corporations that offer or sell unregistered securities).  Moreover,
statements of opinion, including opinions about a security’s value, are
generally not actionable under article 581-33.  See Aegis Ins. Holding Co.,
L.P. v. Gaiser, No. 04-05-00938-CV, 2007 WL 906328, at *6 (Tex. App.—San
Antonio Mar. 28, 2007, pet. denied) (mem. op.) (stating that opinion of value
of security is generally not actionable); Tex. Capital Sec., Inc. v.
Sandefer, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet.
denied) (noting that predictions of increased share prices generally do not
amount to actionable misrepresentations).  Thus, Reynolds failed to carry his
burden under rule 166a(i), and a no-evidence summary judgment was proper on both
of Reynolds’s theories.  See Kastner v. Jenkins & Gilchrist, P.C.,
231 S.W.3d 571, 579, 581 (Tex. App.—Dallas 2007, no pet.) (affirming summary
judgment in favor of “aider and abettor” when respondent failed to prove
primary violation).

          We sustain that part of Murphy’s fourth
issue arising under TSA article 581-33 and NASD rules.

D.  Fiduciary Duty

          Murphy also claims in his fourth issue that because
he was not subject to any laws giving rise to a fiduciary duty and because
prior to filing his lawsuit, “Reynolds had never met or spoken to Murphy[,]” the
trial court erred by denying his motion for no-evidence summary judgment on
Reynolds’s fiduciary duty claims.

          1. 
Applicable Law

          Fiduciary duties arise either from certain
formal relationships that are recognized as fiduciary as a matter of law, or
from the existence of an informal, “confidential” relationship between the
parties.  Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex.
1998).  An informal fiduciary duty may arise from a moral, social, domestic, or
purely personal relationship of trust and confidence, generally called a
confidential relationship.  Hubbard v. Shankle, 138 S.W.3d 474, 483
(Tex. App.—Fort Worth 2004, pet. denied).  A confidential relationship exists
when influence has been acquired and abused and confidence has been extended
and betrayed.  Hoggett v. Brown, 971 S.W.2d 472, 488 (Tex. App.—Houston
[14th Dist.] 1997, pet. denied).  A person is justified in placing confidence
in the belief that another party will act in his best interest only when he is
accustomed to being guided by the other party’s judgment or advice and there
exists a long association in a business relationship as well as personal
friendship.  Id.  Thus, the relationship must exist prior to and apart
from the agreement that is the basis of the suit.  Hubbard, 138 S.W.3d
at 483.  Whether a confidential or fiduciary relationship exists is ordinarily
a question of fact, and the issue only becomes a question of law when it is one
of no evidence.  Crim Truck & Tractor Co. v. Navistar Int’l Transp.
Corp., 823 S.W.2d 591, 594 (Tex. 1992), superseded by statute on other
grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.,
84 S.W.3d 212, 225–26 (Tex. 2002) (op on reh’g).  A party asserting breach of a
fiduciary duty must establish the existence of a confidential or similar
relationship giving rise to a fiduciary duty.  See Bado Equip. Co. v.
Bethlehem Steel Corp., 814 S.W.2d 464, 475 (Tex. App.—Houston [14th Dist.]
1991,no writ) (op. on reh’g).

          2.
Statutory Fiduciary Duties

          Because we conclude above that Murphy was
not subject to TSA articles 581-33 and 581-33-1, the laws giving rise to the
statutory fiduciary duties that Reynolds alleged Murphy violated, we sustain
that part of Murphy’s fourth issue with respect to Reynolds’s statutory-based breach
of fiduciary duty claims.

          3. Informal, or Nonstatutory, Fiduciary
Duties

          Based on the record before us, the only
relationship between the parties involves Reynolds’s individual decision to subscribe
to Technology Investing. Thus, Reynolds failed to show that he had a confidential
relationship with Murphy prior to and apart from his subscription to Technology
Investing.  See Cotten v. Weatherford Bancshares, Inc., 187 S.W.3d
687, 698–699 (Tex. App.—Fort Worth 2006, pet. denied) (holding that no informal
fiduciary relationship existed when plaintiff did not prove confidential
relationship prior to and apart from contract giving rise to his lawsuit). 
Because Reynolds failed to meet his burden under 166a(i) to show the existence
of a fiduciary relationship between the parties giving rise to a duty, we
sustain Murphy’s fourth issue with respect to Reynolds’s informal breach of fiduciary
duty claim as well.

E. 
Fraud Claims

          In his fourth issue, Murphy also argues that
because causation is an element of all of Reynolds’s claims and because
Reynolds cannot prove that Murphy’s actions caused Reynolds’s injury, the trial
court erred by denying his no-evidence motion for summary judgment on all of
Reynolds’s claims.  Thus, we will determine whether a no-evidence summary
judgment is proper on Reynolds’s remaining claims:  common law fraud and fraud
under section 27.01.

          To prevail on a common law fraud claim, a
plaintiff must establish (1) the defendant made a material representation, (2)
the representation was false, (3) the defendant either knew the representation
was false when made or made it recklessly without any knowledge of its truth
and as a positive assertion, (4) the defendant made the representation with the
intention that it be acted upon, (5) the representation was in fact relied
upon, and (6) damage to the plaintiff resulted.  See Ins. Co. of N. Am., 981
S.W.2d at 674; DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990)
(op. on reh’g), cert. denied, 498 U.S. 1048 (1991); Trenholm v.
Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983).  Section 27.01 provides for a
statutory cause of action for fraud in real estate and stock transactions.  See
Tex. Bus. & Com. Code Ann. § 27.01 (West 2009); Burleson State
Bank v. Plunkett, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied).  The
elements of statutory fraud under section 27.01 are essentially identical to
the elements of common law fraud except that section 27.01 does not require
proof of knowledge or recklessness as a prerequisite to the recovery of actual
damages.  See Brush v. Reata Oil & Gas Corp., 984 S.W.2d 720, 726
(Tex. App.—Waco 1998, pet denied); see also Poteet v. Kaiser, No.
02-06-00397-CV, 2007 WL 4371359, at *5 (Tex. App.—Fort Worth Dec. 13, 2007,
pet. denied) (citing Robbins’s conclusion that causation is an essential
element of fraud in a real estate transaction).  “[R]eliance is a necessary
element of a statutory fraud claim under section 27.01.”  Schlumberger Tech.
Corp. v. Swanson, 959 S.W.2d 171, 182 (Tex. 1997).

          Reynolds argues that he “unequivocally
testified that acting in reliance upon the fraudulent investment advice
provided by Murphy[,] he purchased and held securities in his retirement
portfolio that he would not have otherwise purchased or held” and that he
liquidated his holdings when he discovered the truth of Murphy’s fraudulent
operations.  But as was noted in Reynolds I, Reynolds caused his own
losses when he sold stock in 2002 against Murphy’s advice to “hold” the
recommended stocks long-term.  See Reynolds I, 188 S.W.3d at 274.  Thus,
we hold that Reynolds failed to raise a fact issue to show that his reliance on
Murphy’s statements caused his injury, an essential element of both his section
27.01 and common law fraud claims.  Accordingly, we sustain the remainder of
Murphy’s fourth issue.

IV.  Conclusion

          Having sustained Murphy’s third and fourth issues,
we reverse the trial court’s order denying Murphy summary judgment on
Reynolds’s remaining claims and render a final summary judgment in Murphy’s
favor on all of Reynolds’s remaining claims.[11]

 

 

                                                                             BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  LIVINGSTON, C.J.; GARDNER and MCCOY, JJ.

 

DELIVERED:  September 29, 2011









[1]See
Tex. R. App. P. 47.4.





[2]Although
Reynolds challenges our jurisdiction to hear Murphy’s appeal, we have
previously ruled on this matter by denying his prior motion to dismiss the
appeal.





[3]In
his eighth issue, Murphy complains that the trial court erred by overruling his
objections to Reynolds’s affidavit as summary judgment evidence, which we
review under an abuse of discretion standard.  Nat’l Liab. & Fire Ins.
Co. v. Allen, 15 S.W.3d 525, 527–28 (Tex. 2000).  However, we need not
determine if the trial court abused its discretion because, as we set forth
herein, Reynolds did not raise a fact issue on Murphy’s summary judgment
grounds even with the trial court admitting that evidence.  See Tex. R.
App. P. 47.1; see also Reynolds I, 188 S.W.3d at 261–62 (summarizing
Reynolds’s affidavit).





[4]Although
we usually address the no-evidence motion first when both no-evidence and
traditional summary judgment motions are filed, see Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 600 (Tex. 2004), we will review the propriety of
granting the traditional summary judgment on Murphy’s article 581-33-1 claim
first because it is dispositive.  See Tex. R. App. P. 47.1.





[5]Reynolds
I held that as a matter of law, Technology Investing is a general
circulation publication.  See 188 S.W.3d at 266–67.





[6]In
Reynolds I, Reynolds acknowledged that Lowe was based solely on
the Supreme Court’s construction of the IAA.  See 188 S.W.3d at 265
n.19.





[7]In
Reynolds I, we discussed and adopted Ginsburg relative to First
Amendment protection from negligence and negligent misrepresentation claims.  See
188 S.W.3d at 263–65.





[8]Although
Reynolds generally alleged that Murphy violated NASD rules, he mentioned only
NASD Rule 96-60 in his pleadings.





[9]Reynolds
did not attach copies of NASD rule 96-60 or NYSE rule 90-5 to either his
petition or his response to Murphy’s summary judgment motion.





[10]Moreover,
even if Murphy were subject to the rules, we are uncertain whether Reynolds
would have a private right of action for violations of NASD or NYSE rules.  See
Colman v. D.H. Blair & Co., 521 F. Supp. 646, 654 (S.D.N.Y. 1981)
(noting that even though Appellant was within the class that Congress intended
to protect, Appellant did not have a private right of action for NASD and NYSE
rules violations).





[11]Based
on our disposition of Murphy’s third and fourth issues, we do not reach his
remaining issues.  See Tex. R. App. P. 47.1.